MCKOOL SMITH, P.C.
Robin L. Cohen (NJ Attorney ID No. 030501986)
Marc T. Ladd  (*pro hac vice* application to be filed)
Brett D. Bissett (*pro hac vice* application to be filed)
One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400

*Attorneys for Plaintiffs Exchange Traded*
*Managers Group, LLC, ETF Managers*
*Group, LLC, and Samuel Masucci*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EXCHANGE TRADED MANAGERS GROUP, LLC, ETF MANAGERS GROUP, LLC, and SAMUEL MASUCCI,<br><br>        Plaintiffs,<br><br>   v.<br><br>XL SPECIALTY INSURANCE COMPANY,<br><br>        Defendant. | Civil Action No. _____<br><br><br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Exchange Traded Managers Group, LLC ("ETMG"), ETF

Managers Group, LLC ("ETFMG"), both with a principal place of business at 30

Maple Street, Summit, NJ 07901, and Samuel Masucci, an individual residing in,

and a citizen of, the State of New Jersey (collectively, "Plaintiffs"), by and through

-1-

their undersigned counsel, for their Complaint against Defendant XL Specialty Insurance Company ("XL Specialty"), with a principal place of business upon information and belief at 70 Seaview Avenue, Stamford, CT 06902, allege as follows:

## **PRELIMINARY STATEMENT**

1.     This is an action for damages for breach of contract, anticipatory breach of contract, and declaratory relief arising out of XL Specialty's repudiation and breach of its obligations under a Financial Services Liability Policy, No. ELU149445-17, covering the policy period of April 10, 2017 to April 10, 2018 (the "2017-2018 Policy") issued to ETMG and covering all Plaintiffs.  The 2017-2018 Policy obligates XL Specialty to pay for any and all of Plaintiffs' Loss, including Defense Expenses and payments from judgments or settlements, resulting from the lawsuit captioned *Nasdaq, Inc. v. Exchange Traded Managers Group, LLC, et al.*, No. 1:17-cv-08252 (S.D.N.Y.) (the "*Nasdaq* Action").

2.     ETFMG is a registered investment adviser that specializes in exchange traded funds ("ETFs"), investment funds that are a form of security traded on stock exchanges and track certain assets.  Nasdaq, Inc. ("Nasdaq") owns and operates the NASDAQ stock market.

3.     On or about October 26, 2017, Nasdaq sued Plaintiffs in the *Nasdaq*

-2-

Action.  The lawsuit arises mainly out of a dispute between ETFMG and Nasdaq regarding a Wholesaling Platform Services Support Agreement (the "Wholesaling Agreement") entered into between ETFMG's predecessor, GENCAP Advisors, LLC ("GENCAP") and Nasdaq's predecessor, International Securities Exchange, LLC ("ISE").  Nasdaq alleges, *inter alia*, that Plaintiffs' breach of the Wholesaling Agreement caused ETFMG to receive over $600,000 in unjustified reimbursements that it was not entitled to under the Agreement, and Nasdaq also seeks unliquidated damages for alleged lost profits from the operation of the funds.

4.     Plaintiffs provided timely notice of the *Nasdaq* Action to XL Specialty.  In direct violation of the terms of the 2017-2018 Policy, XL Specialty has denied that the 2017-2018 Policy provides coverage for the *Nasdaq* Action and has refused to pay the costs Plaintiffs have incurred in defending the *Nasdaq* Action under the 2017-2018 Policy.

5.     There is no dispute that the *Nasdaq* Action was filed against Plaintiffs during the period of coverage for the 2017-2018 Policy and triggered that Policy year.  However, XL Specialty improperly has taken the position that coverage for the *Nasdaq* Action is triggered under the prior year's policy it sold to ETMG— Financial Services Liability Policy, No. ELU143310-16, covering the policy period of March 10, 2016 to April 10, 2017 (the "2016-2017 Policy")—because the

-3-

*Nasdaq* Action allegedly involves "Interrelated Wrongful Acts" with, and constitutes the same "Claim" as, an earlier lawsuit triggering coverage under the 2016-2017 Policy captioned *PureShares, LLC, d/b/a PureFunds, et al. v. ETF Managers Group, LLC, et al.*, No. C-63-17 (N.J. Super. Ct. Ch. Div., Union Cnty.) (the "*PureShares* Action").

6.     As discussed herein, the *Nasdaq* Action and the *PureShares* Action are not Claims arising from "Interrelated Wrongful Acts" under the 2017-2018 Policy; they have legally distinct claims that allege different wrongs to different people, and are not causally connected.  Plaintiffs are entitled to full coverage for the *Nasdaq* Action under the 2017-2018 Policy.

7.     Plaintiffs seek damages for XL Specialty's breach and anticipatory breach of contract for refusing to comply with its coverage obligations owed under the 2017-2018 Policy, and a declaration as to the existence, scope, and breach of XL Specialty's obligations to pay defense and indemnity expenses arising from the *Nasdaq* Action.

## THE PARTIES

8.     Plaintiff ETMG is a New Jersey corporation with its principal place of business in New Jersey.

9.     Plaintiff ETFMG is a wholly owned subsidiary of ETMG and is a

-4-

registered investment adviser under the Investment Company Act of 1940.
ETFMG is a New Jersey corporation with its principal place of business in New
Jersey.

10.     Plaintiff Samuel Masucci is the co-founder and Chief Executive
Officer of ETFMG and is an individual residing in, and a citizen of, New Jersey.

11.     Upon information and belief, Defendant XL Specialty is a Delaware
corporation with its principal place of business in Connecticut.  Upon information
and belief, XL Specialty is authorized to sell or write insurance in New Jersey and,
at all material times, has conducted and continues to conduct substantial insurance
business in New Jersey.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to
28 U.S.C. § 1332(a).  This action is between citizens of different States, and the
amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C.
§ 1391(b).

## FACTUAL ALLEGATIONS

### I.     THE 2017-2018 INSURANCE POLICY

14.     The 2017-2018 Policy that XL Specialty sold to ETMG is a "claims-

made" policy that covers the policy period of April 10, 2017 to April 10, 2018, and includes four coverage parts: (1) Investment Advisors Management Liability Coverage; (2) Investment Advisers Professional Liability Coverage ("IAPL Coverage"); (3) Investment Fund Management and Professional Liability Coverage ("IFMPL Coverage"); and (4) Employment Practices Liability Coverage. A copy of the 2017-2018 Policy is attached hereto as Exhibit A.

15.    Subject to satisfaction of the applicable retention per Claim for each coverage part, the 2017-2018 Policy provides coverage for a maximum aggregate limit of liability of $5,000,000.  *See* 2017-2018 Policy, Declarations Item 3, Limits of Liability.

16.    Under both the IFMPL and IAPL Coverage parts, XL Specialty agreed it "will pay on behalf of the **Insureds Loss** resulting from **Claims** first made against the **Insureds** during the **Policy Period** or, if applicable, the Optional Extension Period for their **Wrongful Acts**."  *See* 2017-2018 Policy, IFMPL Coverage, § I; IAPL Coverage, § I.

17.    Under the IFMPL Coverage part, coverage for "**Wrongful Acts**" includes:

(1)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty committed or attempted, or allegedly committed or attempted, by an **Insured** in the performance of, or actual or alleged failure to perform,

**Professional Services**,

[…]

(3)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty committed or attempted, or allegedly committed or attempted, by an **Insured Person** in his or her capacity as a director, officer, partner, principal, member, trustee or employee of an **Investment Fund**…, [and]

(4)     any matter asserted against an **Insured Person** solely by reason of his or her status as a director, officer, partner, principal, member, trustee or employee of an **Investment Fund**….

*See* 2017-2018 Policy, IFMPL Coverage, § II.J.

18.     "**Professional Services**" under the IFMPL Coverage part includes, but is not limited to, "investment management…or other services, including…performed for or on behalf of a Private Fund," "the formation, administration, marketing and solicitation, raising capital…and the solicitation or sale of shares or interests in, any Private Fund," and "the operation or management of a Private Fund."  *See* 2017-2018 Policy, IFMPL Coverage, § II.I.

19.     Under the IFMPL Coverage, the 2017-2018 Policy provides coverage for "**Insureds**" that include, *inter alia*, "the **Named Insured**," "**Insured Persons**," "each **Investment Fund**," and "any entity which is a direct or indirect management company of an **Investment Fund**."  *See* 2017-2018 Policy, IFMPL Coverage, § II.A.  "**Insured Persons**" include "a director, partner, principal, member, trustee or employee of…an **Investment Fund**…or any **Insured Entity**."

-7-

*See id.* § II.C and Endorsement No. 9. "**Insured Entity**" means "any **Insured** that is organized as a corporation, limited liability company or limited partnership." *See id.* § II.B. "**Investment Fund**" includes any fund listed in the "Schedule of Investment Funds" in the 2017-2018 Policy. *See id.* § II.D, Endorsement No. 2.

20.     Separately, under the IAPL Coverage part, coverage for "**Wrongful Acts**" includes:

> (5)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty committed or attempted, or allegedly committed or attempted, by an **Insured** in the performance of, or actual or alleged failure to perform, **Professional Services**....

*See* 2017-2018 Policy, IAPL Coverage, § II.E(1).

21.     "**Professional Services**" under the IAPL Coverage part includes, but is not limited to, "the formation, capitalization, operation, management, administration, marketing and solicitation, raising capital…of an Investment Vehicle" and "investment management…or other services performed for or on behalf of an Investment Vehicle or customer client of the Insured." *See* 2017-2018 Policy, IAPL Coverage, § II.D.

22.     For the IAPL Coverage, the 2017-2018 Policy provides coverage for "**Insureds**" that means the "**Adviser** and the **Insured Person**," which include, *inter alia*, "the **Named Insured**," "any **Subsidiary** created or acquired on or

before the Inception Date…or during the **Policy Period**," and "any director,

officer, partner, principal, member, trustee or employee" of these entities. *See*

2017-2018 Policy, IAPL Coverage, §§ II.A-II.C, and Endorsement Nos. 10, 11.

23.     ETMG is "the **Named Insured**" under the 2017-2018 Policy. *See*

2017-2018 Policy, General Terms and Conditions, § I.H; *id.*, Declarations Item 1.

24.     ETFMG is an **Insured** under the 2017-2018 Policy as, but not limited

to, a direct or indirect management company of an **Investment Fund** and a

**Subsidiary**.

25.     Mr. Masucci is an **Insured** and **Insured Person** under the 2017-2018

Policy as, but not limited to, a director, officer and employee of ETMG and

ETFMG.

26.     Under the General Terms and Conditions applicable to all coverage

parts of the 2017-2018 Policy, "**Claim**" is defined to include, among other things,

"[a]ny written notice received by an **Insured** that any person or entity intends to

hold any **Insured** responsible for a **Wrongful Act**," "any civil proceeding in a

court of law or equity, or arbitration," and "any written demand upon an **Insured**

for monetary or nonmonetary relief, commenced by receipt of such demand." *See*

2017-2018 Policy, General Terms and Conditions, §§ I.B(1), (2) and (4).

27.     "**Loss**" is defined to include "damages, judgments (including pre- and

post-judgment interest), settlements or other amounts (including punitive or exemplary damages where insurable by law)…and **Defense Expenses**…in excess of the retention," and **Defense Expenses** is defined as the "reasonable costs, charges, fees (including but not limited to legal fees and experts' fees) and expenses incurred in the investigation and/or defense of any **Claim**…." *See* 2017-2018 Policy, General Terms and Conditions, §§ I.C and I.G.

28.    Lastly, the 2017-2018 Policy contains a provision defining "**Interrelated Wrongful Acts**" as "causally connected **Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or a series of related facts, circumstances, situations, transactions or events." *See* 2017-2018 Policy, General Terms and Conditions, § I.F.  Further, the Policy provides that "[a]ll **Claims** arising from **Interrelated Wrongful Acts** will be deemed to constitute a single **Claim** and will be deemed to have been made at the earliest time at which the earliest such **Claim** is made or deemed to have been made…." *Id.* § II.D.

29.    The 2017-2018 Policy is a renewal of the 2016-2017 Policy that XL Specialty sold to ETMG, and contains substantially the same terms and provides materially the same scope of coverage as the 2017-2018 Policy.  Same as the 2017-2018 Policy, the 2016-2017 Policy also provides coverage for a maximum

aggregate limit of liability of $5,000,000 subject to satisfaction of the applicable retention per **Claim** for each coverage part.  A copy of the 2016-2017 Policy is attached hereto as Exhibit B.

## II.    THE *NASDAQ* ACTION

30.    On or about October 26, 2017, Nasdaq sued Plaintiffs in the *Nasdaq* Action.  A copy of the Complaint in the *Nasdaq* Action is attached hereto as Exhibit C ("*Nasdaq* Complaint").

31.    The *Nasdaq* Action alleges that beginning in 2012, Nasdaq's predecessor, ISE, partnered with PureShares LLC d/b/a PureFunds ("PureShares") to develop and launch a line of ETFs under the PureShares brand (the "PureFunds ETFs").  *See Nasdaq* Complaint ¶¶ 18 & 22.

32.    In April 2013, ISE separately entered into an agreement with ETFMG's predecessor, GENCAP, to conduct wholesale marketing under the Wholesaling Agreement, which obligated ISE (and later Nasdaq) to pay ETFMG to engage in wholesaling for ETFs supported by ISE/Nasdaq and other third-party ETFs.  *See id.* ¶ 34.  The goal of the Wholesaling Agreement was to build a comprehensive labor intensive sales organization to sell both ISE and non-ISE supported ETFs.

33.    PureShares was never a party to, nor had any role whatsoever, in the

-11-

Wholesaling Agreement. In addition, the Wholesaling Agreement covered several funds that were unrelated to the PureFunds brand.

34.    In 2015, ISE, PureShares, and ETFMG entered into a "Sublicense Agreement" that granted ETFMG the right to use ISE/Nasdaq's indexes and operate the PureFunds ETFs. *See id*. ¶¶ 25-29. ISE and/or PureShares also entered into operating agreements for each ETF to be registered under the Investment Company Act of 1940, each titled the "SEC '40 Act Platform Services Agreement" (collectively, the "40 Act Agreements"). *See id*. ¶¶ 31-32.

35.    Nasdaq alleges in the *Nasdaq* Action that Plaintiffs sought to terminate their various agreements with Nasdaq to no longer pay Nasdaq profits from certain ETFs, including PureFunds ETFs. *See id*. ¶¶ 41-49.

36.    In particular, Nasdaq claimed that Plaintiffs "violated" the Wholesaling Agreement and "forced ISE/Nasdaq to pay, through impermissible set-offs, . . . substantial expenses ISE/Nasdaq was not obligated to pay." These impermissible set-offs included "$102,000 and $131,000 in 2015 and 2016, respectively" for expenses not previously agreed to in writing, and $432,000 and $396,000 spent on two "wholesalers" in 2015 and 2016, respectively, when the limit on such expenses was $250,000. *Id.* ¶ 53.

37.    As a result of these alleged acts, as well as allegedly misleading

statements in the performance of Plaintiffs' operation and management of the PureFunds ETFs, Nasdaq alleges that Plaintiffs breached the Sublicense Agreement, Wholesaling Agreement, and 40 Act Agreements. *See id.* ¶¶ 50-58. Nasdaq also informed ETFMG that it was terminating the Wholesaling Agreement unless ETFMG cured the alleged breaches. *Id.* ¶ 54.[1]

38.     In Count One of its claim for relief alleging breach of the Sublicense Agreement, Wholesaling Agreement, and 40 Act Agreements, Nasdaq quantifies damages only for breach of the Wholesaling Agreement as "over $600,000 in expenses Nasdaq was not obligated to pay." *See id.* ¶ 61.

39.     Nasdaq's other claims for relief of Conversion (Count Two), Unfair Competition (Count Three), Unjust Enrichment (Count Four), Quantum Meruit (Count Five), and Breach of the Duty of Good Faith and Fair Dealing (Count Six) relate to these same alleged breaches and wrongful acts. *See id.* ¶¶ 59-89.

40.     Nasdaq named Mr. Masucci only as a defendant for its allegations for Count Two (Conversion) based on his alleged "dominion and control over the

---

[1] ETFMG's damages expert has valued ETFMG's interest in the Wholesaling Agreement to be in excess of $55 million.

ETFMG Defendants with respect to the misappropriation from Nasdaq of the PureFunds ETFs." *Id.* ¶ 68.[2]

41.     Nasdaq seeks, *inter alia*, compensatory damages, pre- and post-judgment interest, attorney's fees, costs, and other equitable relief as a result Plaintiffs' alleged wrongful acts.  *See Nasdaq* Complaint (Prayer for Relief).

42.     Plaintiffs to date have accumulated hundreds of thousands of dollars in costs defending the *Nasdaq* Action.

## III.   XL SPECIALTY'S DENIAL OF COVERAGE FOR THE *NASDAQ* ACTION UNDER THE 2017-2018 POLICY

43.     Plaintiffs timely notified XL Specialty of the *Nasdaq* Action.

44.     There is no dispute that the *Nasdaq* Action was filed against Plaintiffs during the policy period for the 2017-2018 Policy.

45.     Nevertheless, XL Specialty has denied its coverage obligations to Plaintiffs for the *Nasdaq* Action under the 2017-2018 Policy.

46.     Subject to a reservation of rights, XL Specialty admitted coverage for the *Nasdaq* Action under the materially similar terms and coverage of the 2016-2017 Policy.  However, XL Specialty has taken the position that the "2017-2018

---

[2] On or about August 21, 2018, the court in the *Nasdaq* Action granted Mr. Masucci's motion to dismiss the sole claim against him, and Mr. Masucci is no longer a defendant in the *Nasdaq* Action.

Policy is not responsive because the *Nasdaq* Action involves interrelated wrongful acts as [a] prior litigation reported in the 2016-2017 Policy period."

47.     Specifically, XL Specialty contends that the *Nasdaq* Action and the earlier-filed *PureShares* Action, the latter of which XL Specialty also has acknowledged coverage for under the 2016-2017 Policy, involve "**Interrelated Wrongful Acts**," *i.e.*, "causally connected **Wrongful Acts** which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related, or a series of related facts, circumstances, situations, transactions or events." Thus, according to XL Specialty, coverage for the *Nasdaq* Action is excluded under the 2017-2018 Policy because the *Nasdaq* Action constitutes the same "**Claim**" as the *PureShares* Action, and both Actions are deemed to have been made under 2016-2017 Policy, triggering only that Policy year's coverage limit for both Actions.

48.     The *PureShares* Action and *Nasdaq* Action are not the same "Claim" and do not arise from "Interrelated Wrongful Acts" under the 2017-2018 Policy. The *PureShares* Action arises out of allegations by PureShares and its Chief Executive Officer Andrew Chanin alone against not only ETFMG and Mr. Masucci, but also against another ETMG entity and Bernard Karol, ETFMG's President.

-15-

49.     At issue in *PureShares* Action are claims by PureShares that it suffered damages arising from a dispute in late 2016 and 2017 that defendants allegedly were leaving PureShares out the decision-making process in the management of PureFunds ETFs, in contravention of various alleged agreements, primarily a Business Management Agreement (and associated Side Letter) entered into by ETFMG, beginning in October 2012 and expiring on its own terms in October of 2015, almost two years prior to Nasdaq's acquisition of ISE.

50.     Additionally, the *PureShares* Action alleged that the defendants defamed and caused emotional distress to Mr. Chanin, and that Mr. Karol, supposedly acting as legal advisor to PureShares as part of the parties' agreements, committed legal malpractice and breached his fiduciary duty to PureShares.

51.     In contrast, the dispute in the *Nasdaq* Action is solely between Nasdaq and Plaintiffs, and is centered primarily on Nasdaq's desire to escape its contractual obligations under the Wholesaling Agreement entered into in April 2013 between Nasdaq'a processor, ISE, and ETFMG.

52.     While the *Nasdaq* Action and *PureShares* Action both reference PureFunds ETFs and ETFMG's management of the same, the *PureShares* Action mentions Nasdaq only in ancillary fashion, and neither PureShares nor Nasdaq are parties in each other's Actions, nor are they required to be parties in said Actions

for any requested relief to be granted.  PureShares is not, and never was, a party to the Wholesaling Agreement, and that Agreement is not the subject of the *PureShares* Action.  The complaint in the *Nasdaq* Action, in turn, quantifies damages only for Plaintiffs' alleged breach of the Wholesaling Agreement based on alleged impermissible set-offs that allegedly occurred before the dispute in the *PureShares* Action arose, and seeks unliquidated damages for alleged lost profits in the operation of the funds.

53.     Both PureShares and Nasdaq had separate and unique agreements covering each of their respective roles pertaining to ETFMG.  Those separate and unique agreements were independently breached by the misconduct of PureShares and Nasdaq, respectively.[3]

54.     Any similar allegations in the *Nasdaq* Action and *PureShares* Action concerning the management and operation of the PureFunds ETFs do not change that the two Actions have legally distinct claims that allege different wrongs to different people, are not causally connected, and do not arise from "**Interrelated Wrongful Acts**" constituting a single "**Claim**" under the two Policies.

---

[3] Had *just one* of either PureShares or Nasdaq breached their respective agreements, ETFMG could have terminated just the breaching party and kept the other agreement in force with the non-breaching party.

55.     Despite timely notification and request for coverage, XL Specialty has refused to honor its coverage obligations for the *Nasdaq* Action under the 2017-2018 Policy.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT – DUTY TO PAY DEFENSE COSTS)

56.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 55 of this Complaint as if fully set forth herein.

57.     Pursuant to the terms of the 2017-2018 Policy, XL Specialty is obligated to pay Plaintiffs' reasonable costs and legal fees and expenses in excess of the applicable retention incurred in the defense of the *Nasdaq* Action, up to the limits of the 2017-2018 Policy.

58.     XL Specialty has breached its obligations under the 2017-2018 Policy by failing and refusing to pay Plaintiffs' reasonable costs and legal fees and expenses in excess of the applicable retention incurred in the defense of the *Nasdaq* Action under the 2017-2018 Policy, instead limiting coverage for the *Nasdaq* Action to the limits of the 2016-2017 Policy.

59.     Plaintiffs have complied with all terms, conditions and prerequisites to coverage set forth in the 2017-2018 Policy.

60.     As a result of XL Specialty's breach, Plaintiffs have accumulated costs at this time in the amount of hundreds of thousands of dollars, and will

continue to incur costs that are properly payable under the 2017-2018 Policy. Additionally, as a result of XL Specialty's breach, Plaintiffs have suffered damages in the form of loss of coverage amounts available under the 2016-2017 Policy due to XL Specialty's incorrect determination that payment for costs in the *Nasdaq* Action is owed under that Policy, instead of under the 2017-2018 Policy.

**SECOND CAUSE OF ACTION**
**(ANTICIPATORY BREACH OF CONTRACT – DUTY TO INDEMNIFY)**

61.   Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62.   Pursuant to the terms of the 2017-2018 Policy, XL Specialty is obligated to pay all damages, judgments (including pre- and post-interest judgment interest), settlements or other amounts (including punitive or exemplary damages where insurable by law) in excess of the applicable retention in connection with the *Nasdaq* Action, up to the limits of the 2017-2018 Policy.

63.   To the extent the *Nasdaq* Action is covered under the 2017-2018 Policy, XL Specialty has anticipatorily repudiated its obligations to pay such losses under the 2017-2018 Policy, in that XL Specialty has unequivocally demonstrated that it will not make any payment toward the *Nasdaq* Action under the 2017-2018 Policy.

64.   Plaintiffs have complied with all terms, conditions and prerequisites to

coverage set forth in the 2017-2018 Policy.

65.     As a result of XL Specialty's anticipatory breach of its obligations

under the 2017-2018 Policy, Plaintiffs will suffer compensatory and consequential

damages.

## THIRD CAUSE OF ACTION
### (DECLARATORY RELIEF)

66.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1

through 65 of this Complaint as if fully set forth herein.

67.     Pursuant to the terms of the 2017-2018 Policy, XL Specialty is

obligated to pay Plaintiffs' reasonable costs and legal fees and expenses in excess

of the applicable retention incurred in the defense of the *Nasdaq* Action, up to the

limits of the 2017-2018 Policy.

68.     Pursuant to the terms of its 2017-2018 Policy, XL Specialty is

obligated to pay all damages, judgments (including pre- and post-interest judgment

interest), settlements or other amounts (including punitive or exemplary damages

where insurable by law) in excess of the applicable retention in connection with the

*Nasdaq* Action, up to the limits of the 2017-2018 Policy.

69.     Upon information and belief, XL Specialty disputes its legal

obligations to pay such costs.

70.     Plaintiffs are entitled to a declaration by this Court of XL Specialty's

obligations under the 2017-2018 Policy with regard to the *Nasdaq* Action.

71.     An actual controversy of a justiciable nature presently exists between Plaintiffs and XL Specialty concerning the proper construction of the 2017-2018 Policy, and the rights and obligations of the parties thereto with respect to losses incurred in connection with the *Nasdaq* Action.

72.     The issuance of declaratory relief by this Court will terminate the existing controversy among the parties.

73.     Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Plaintiffs and against XL Specialty, declaring that XL Specialty is obligated under the 2017-2018 Policy to pay all losses incurred in connection with the *Nasdaq* Action, subject to the applicable retention and limits of the 2017-2018 Policy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

i.      On the first cause of action, Plaintiffs request that the Court enter judgment against XL Specialty, awarding Plaintiffs compensatory and consequential damages in an amount to be determined in this action;

ii.     On the second cause of action, Plaintiffs request that the Court enter judgment against XL Specialty, awarding Plaintiffs compensatory and

consequential damages in an amount to be determined in this action;

iii.     On the third cause of action, Plaintiffs request that this Court enter a declaratory judgment in favor of Plaintiffs and against XL Specialty declaring that that XL Specialty is obligated under the 2017-2018 Policy to pay all losses incurred in connection with the *Nasdaq* Action, subject to the applicable retention and limits of the 2017-2018 Policy;

iv.     On all causes of action, Plaintiffs request that the Court award Plaintiffs all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees, as well as pre- and post-judgment interest; and

v.     Plaintiffs request such other and further relief as the Court deems just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all matters.

Dated: New York, New York
November 30, 2018

MCKOOL SMITH, P.C.

By: s/ Robin L. Cohen
Robin L. Cohen (NJ Attorney ID No. 030501986)
Marc T. Ladd (*pro hac vice* application to be filed)
Brett D. Bissett (*pro hac vice* application to be filed)
One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400

*Attorneys for Plaintiffs Exchange Traded Managers Group, LLC, ETF Managers Group, LLC, and Samuel Masucci*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify under penalty of perjury that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: New York, New York
November 30, 2018

By: s/ Robin L. Cohen
Robin L. Cohen (NJ Attorney ID No. 030501986)

One Bryant Park, 47th Floor
New York, New York 10036
Tel: (212) 402-9400

-24-